## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHELE LAMAR,

    *Plaintiff,*

    *v.*

NANCY A. BERRYHILL, Commissioner of Social Security,

    *Defendant*.

No. 3:17-cv-1019 (MPS)

## MEMORANDUM AND ORDER

Michele Lamar filed this appeal of the Commissioner of Social Security's decision to deny her application for Title II Disability Insurance Benefits. Under 42 U.S.C. § 405(g), she asks this Court to reverse the decision of the Commissioner because it was not supported by substantial evidence or, alternately, to remand to the Commission for a rehearing. (ECF No. 17.)  Because I find that the Administrative Law Judge ("ALJ") did not adequately explain why Lamar had no listed impairments, I GRANT in part Lamar's motion to reverse or remand, DENY the Commissioner's motion to affirm, and remand to the Commissioner.

## I.    Background

### A.    Factual Background

#### 1.    *Stipulated facts*

##### a.  Medical Chronology

I incorporate by reference the parties' stipulated Medical Chronology. (ECF No. 17-2.)[1]  I recite here only those portions of the chronology that are particularly relevant to my decision:

On November 14, 2012, Lamar complained of "spells since 2011." (ECF No. 17-2 at 3; R. at 957.)  She reported that she would get a sensation of drowsiness and then pass out. (*Id.*)  She had five or six of these events per month, of varying intensity. (*Id.*)

On February 19, 2013, Lamar had an ambulatory EEG, which was abnormal due to the presence of temporal intermittent rhythmic delta activity ("TIRDA") and temporal intermittent rhythmic theta activity ("TIRTA"), which, although not specific for complex partial seizures, is a common finding in patients with complex partial seizures. (ECF No. 17-2 at 3; R. at 627.)  No other focal lateralized or epileptiform features were seen. (*Id.*)

On April 28, 2013, Lamar was brought to the emergency room for hypertension and had a neurology consult due to a series of seizures. (ECF No. 17-2 at 3.)  According to witnesses, Lamar had between one to four seizures leading up to the episode, which were characterized by falling to the floor, eyes rolling to the back of her head, and shaking of the right arm, without full loss of consciousness. (*Id.*; R. at 449, *repeated at* R. 616, 712, 906, 927.)  The final seizure resulting in Lamar's fall was unwitnessed. (*Id.*)

---

[1] Although the parties did not comply with this Court's order requiring a joint Stipulation of Facts or identification of disputed facts (ECF No. 15), I treat the Commissioner's "adopt[ion]" of the plaintiff's statement of facts (ECF No. 20 at 2) as stipulating to the plaintiff's medical chronology (ECF No. 17-2).

On April 28, 2013, Lamar visited the emergency room because of seizures. (ECF No. 17-2 at 4.) She had sustained a witnessed seizure and struck the back of her head. (*Id.*)

On September 9, 2013, Lamar was evaluated by Dr. Pue Farooque. (ECF No. 17-2 at 4; R. at 687.) She described her seizures as "zoning out," feeling like things were becoming distant, becoming hot and sweaty with a racing heart, feeling lightheaded, and then losing consciousness. (*Id.*) Lamar noted that after the episode her whole body was shaking and she was confused. (*Id.*) She had no tongue biting but had associated urinary incontinence. (*Id.*) She reported that the frequency of seizures was initially once a month but had increased to 2 to 3 times per month. (*Id.*) Dr. Farooque noted at this time that these episodes could have been epileptic seizures, but they could also have been of cardiac origin. (*Id.*)

On November 12, 2015, Lamar was admitted to Yale Hospital to be discharged on November 20, 2015. (ECF No. 17-2 at 8; R. at 1175.) She presented for spell characterization. Lamar had stayed in-patient for a week in January 2014, and reported that since that stay she had developed a second type of seizure with multiple events earlier that year. (*Id.*) She described the first type of spell as feeling that people were far away, even though they were standing right next to her. (*Id.*) She said that she would lose consciousness within seconds and begin to shake all over. (*Id.*) She also had loss of urinary control, and, afterward, she would be exhausted and confused. (*Id.*) The second type of spell started with right hand shaking and continued to loss of consciousness and full body shaking. (*Id.*) She reported that she had lost urinary control and bitten her tongue in the past. (*Id.*) Lamar said she would be exhausted and confused afterward. (*Id.*) Lamar reported that both types would last 2 to 3 minutes and happen every couple of weeks. (*Id.*)

b.   Non-medical evidence[2]

Lamar testified at her hearing before the ALJ on November 5, 2015. (ECF No. 17-1 at 12.)
Lamar was 49 years old on her alleged onset date and 54 years old as of the date of the hearing
and ALJ's decision. (ECF No. 20 at 8.)  Lamar testified at the hearing that she lived with her son,
who worked, that she finished high school, and that she used to work as an assistant teacher in a
daycare center until her seizures became too frequent. (*Id.*)  She stated that she felt weak due to
her medications and could not lift more than five pounds or walk more than 50 feet. (*Id.*)  She
testified that she did not cook but could wash and get dressed by herself, that she remembered to
take her medication, and that her neighbor did her laundry and grocery shopping and drove Lamar
where she needed to go. (*Id.*)  Lamar testified that she did not travel and that she read the Bible a
lot to pass the time. (*Id.*)  Her neighbor, Stacey Orr, testified that she drove Lamar to the hearing
and had witnessed Lamar's seizures where Lamar would shake, her eyes would roll back in her
head, and, at times, she would go to the bathroom on herself. (*Id.* at 8–9.)  Orr testified that she
believed Lamar had had over 100 seizures in the past year. (*Id.* at 9; R. at 85–86)

Lamar testified that she stopped working in February 2011, when she had a seizure while
waiting for the bus and injured both of her ankles. (ECF No. 17-1 at 12.)  After that, her seizures
became frequent. (*Id.*)  Lamar explained that she took Keppre and Levetiracetam for seizures, but
that the seizures had gotten worse recently. (*Id.*)  Lamar said that she was unable to lift things that
she used to and that her legs "buckle[d] from weakness." (*Id.*) She testified that she could lift a
maximum of five pounds, and that sometimes, she dropped things that she was holding. (*Id.*)
Lamar said that she relied on her neighbors for rides. (*Id.*)

---

[2] These facts are drawn from the plaintiff's and defendant's briefs (ECF No. 17-1 at 12;
ECF No. 20 at 8–9), and again I treat them as stipulated.

Lamar also testified that she had headaches that became excruciating when she opened the blinds. (ECF No. 17-1 at 12.)  She also said that she would go to the hospital for particularly bad seizures. (*Id.*)  She testified that she would sometimes lose control of her bowels and bladder. (*Id.*)  She would experience numbness of the left side of her body for the two to three minute duration of the seizures, but, even when they were over, she would feel "absolutely exhausted" and had to lie down for the rest of the day. (*Id.*)  Lamar testified that in addition to larger seizures, she would have "mild seizures" two to three times a week. (*Id.*)

Lamar testified that she was five feet and one inch tall and that she weighed almost 300 pounds. (ECF No. 17-2 at 12.)

In an August 22, 2013 questionnaire, Lamar also indicated that she has 20 or more seizures in an average month, lasting two minutes or longer, with her last seizure occurring on August 20, 2013. (ECF No. 20 at 9.)  Lamar reported that she typically loses consciousness for some time during the seizures, shakes, and sometimes cannot see afterwards. (*Id.*)  She stated that the seizures occur during both the day and night and that, if they occur while she is asleep, she can go to the bathroom on herself. (*Id.*)  In her function report completed the same day, Lamar reported that she could walk for five to ten minutes before needing to stop and rest, could pay attention for ten minutes, could follow written instructions and spoken instruction moderately well, was previously laid off for not getting along with others but could generally get along with authority figures, could handle stress and changes in routine, could prepare her own meals on a daily basis (except when she has seizures), cleans and does laundry weekly, cannot go out alone because of her seizures and does not drive, shops once a month, and cannot pay bills or handle a savings account (but that her finances were handled by her son). (*Id.*)  Lamar reported that she was living in an apartment with her family and spent her day taking medications, eating, reading, watching television, spending

time with others, going to church, and going to doctors' appointments. (*Id.*) She noted that her current condition prevented her from working and affected her sleep and that she had problems completing tasks and getting along with others. (*Id.*) She provided similar responses in a subsequent function report dated February 7, 2014. (*Id.*)

### 2. *Additional Medical Evidence Cited by the Commissioner*

In addition to adopting the above facts, the Commissioner pointed to the following additional medical evidence in the record. (ECF No. 20 at 2–9.)

When Lamar visited the emergency room on October 21, 2010, she had no history of seizures, and her physical examination showed that she was fully oriented to person, place, and time. (ECF No. 20 at 2.)

When Lamar went to the emergency room on February 16, 2011, her examination showed that her mental state was not compromised and that she had normal motor strength. (ECF No. 20 at 2.) Her discharge summary indicated that she previously had vertigo and syncope and had sustained an ankle sprain; she was instructed to see an orthopedist, use crutches as needed, and wear a splint on her ankle for 72 hours. (*Id.* at 2–3.)

Lamar had an appointment at Norwalk Internal Medicine Services on July 14, 2011, where she complained of vertigo. (ECF No. 20 at 3.) She was assessed to have hypertension and obesity, and it was noted that she was not compliant with treatment, because she had missed five to six appointments and was instructed to find another doctor in the community. (*Id.*)

Lamar began care with Dr. Martin Perlin on September 16, 2011. (*Id.*) Lamar reported at the time that she generally felt well, with minor complaints, and she related her visit to the emergency room for vertigo. (*Id.*) On examination, Lamar was cooperative, well-groomed, in no acute distress, had normal chest, lung, cardiovascular, and neurological examinations, and normal

strength in all four extremities. (*Id.*) The examination findings from the September 16, 2011 visit remained generally unchanged during follow-up visits with Dr. Perlin on February 9, 2012, May 21, 2012, and May 9, 2013. (*Id.*) In an appointment with Dr. Perlin on October 21, 2011, Lamar said that she slept, on average, eight hours per night and had a tightness in her rib area, but no other complaints. (*Id.*)

When Lamar visited the emergency room on September 24, 2012, her blood tests showed that her Keppra level was 29 mcg/mL. (ECF No. 20 at 4; R. at 592, 962.) The therapeutic level for Keppra is 12.0–46.0 mcg/mL. (ECF No. 20 at 4 n.1.) When she visited the emergency room on April 28, 2013, her blood level of Keppra was 46.6 mcg/mL. (ECF No. 20 at 4; R. at 433, 601.) At that time, Dr. Daryl Story reviewed Lamar's CT scan and laboratory results and recommended a second drug besides Keppra, such as carbamazepine. (ECF No. 20 at 4.) Dr. Story noted that Lamar would see Dr. Perlin in two weeks and that he would draw a carbamazepine level and perform basic surveillance blood testing, but Dr. Perlin's notes from Lamar's May 9, 2013 visit do not include results of her blood test. (*Id.* at 5; R. at 451.)

In her August 20, 2013 visit to the emergency room for seizures, Lamar's laboratory results showed that her blood level contained 5.9 mcg/mL of carbamazepine and 27.8 mcg/mL of Keppra. (ECF No. 20 at 5; R. at 431, 599, 948.) In her August 22, 2013 neurological and physical exams, Lamar reported feeling dizzy when walking and described her seizure episodes, but she was alert, oriented, cooperative, in no distress, well nourished, had 5/5 motor strength, and intact sensation. (ECF No. 20 at 5; R. at 690–91, *repeated at* 753–54.)

On October 10, 2013, Lamar had an appointment with Dr. Jeremy Moeller about her seizures. (ECF No. 20 at 5.) Dr. Moeller noted that Lamar's sister's description of Lamar's seizures was not typical of tonic-clonic or usual complex partial seizures. (*Id.*; R. at 780.)

Although Lamar reported feeling dizzy when walking, Dr. Moeller's examination noted that she was in no distress, had normal affect, was cooperative, appeared well-nourished, was alert and oriented, had good memory, and had fluent speech. (ECF No. 20 at 5; R. at 784, *repeated at* 796–97, 820, 903.) Lamar's motor bulk and tone were also normal, and her strength was full. (ECF No. 20 at 5; R. at 784.) Dr. Moeller wrote that "[t]hese spells did not respond to Keppra or Tegretol. The differential could be seizures vs non-epileptic spells? vs cardiogenic/vasovagal with severe diaphoresis with syncopal seizures." (R. at 784.) He "recommend[ed] VEEG monitoring for spell characterization—scheduled in jan 2013 [sic]. MRI brain Seizure protocol is normal." (*Id.*)

Lamar had an October 17, 2013 appointment with Dr. Daniel Brooks to discuss her headaches. (ECF No. 20 at 6.) According to the treatment notes, Lamar was alert, oriented, had intact memory, language, and cognition in her neurological examination, was cooperative and in no apparent distress, had 5/5 motor strength, and planned to lose weight, exercise more, and stop smoking. (ECF No. 20 at 6; R. at 772–75, *repeated at* 809–11.)

On October 29, 2013, Dr. Firooz Golkar, a medical consultant from the State Disability Determination Service (DDS), diagnosed Lamar with minor motor seizures as her primary impairment and noted that Listing 11.03 was the applicable listing for consideration of that disorder. (ECF No. 20 at 6; R. at 107–09.) He found that Lamar's condition did not meet the standard for that listing. (*Id.*) He then concluded that Lamar had no exertional limitations, could never climb ladders, ropes, or scaffolds because of her seizure disorder (but could engage in other postural activities frequently), should avoid concentrated exposure to vibrations and pulmonary irritants, and should avoid all exposure to hazards. (*Id.*; R. at 108–09, 121–22.)

On November 7, 2013, Lamar met with Dr. Christopher P. Gottschalk, and she complained of headaches and trouble sleeping. (ECF No. 20 at 6.)  Dr. Gottschalk explained that Obstructive Sleep Apnea is the single most powerful risk factor for migraine chronification, and he advised Lamar to have a sleep consultation and participate in a weight-loss program. (*Id.*; R. at 827–28.)  At this visit, Lamar reported that two to three tablets of Advil helped her headaches temporarily. (ECF No. 20 at 6; R. at 828.)  She also stated that she had not experienced any seizure events in October. (ECF No. 20 at 6, R. at 827.)  Lamar also reported cognitive slowing, difficulty remembering things, occasional slurred speech, and numbness/tingling in her arms (right greater than left). (ECF No. 20 at 6, R. at 828–29.)  The progress notes of the examining physician, Dr. Sarah Dolgonos, state that upon examination, Lamar was oriented to place, year, and situation. (ECF No. 20 at 6, R. at 828–29.) Although she was confused about the month, Dr. Dolgonos noted that Lamar had just taken Xanax in connection with an MRI. (ECF No. 20 at 7; R. at 829.)  Dr. Dolgonos otherwise observed that Lamar displayed fluent language, that her ability to name objects was intact, that she could follow complex commands, and that she spelled "world" backwards without error. (*Id.*)  Lamar had normal motor bulk and tone, and her strength was effort-limited, but without focal deficit. (*Id.*)  Her sensation was intact to light touch and reflexes were normal and symmetric. (*Id.*)  Lamar's gait was slightly antalgic but otherwise steady and narrow-based. (*Id.*)

Lamar was admitted to Yale Hospital on January 7, 2014, and discharged on January 14, 2014—in good condition on each date—for continuous video EEG monitoring to learn more about her seizures. (ECF No. 20 at 7; R. at 843, *repeated at* 896–97, 1057–58, 1060–71.)  In connection with this test, Lamar tapered off the medications used to treat her seizures. (*Id.*)  Lamar had a few

"push button events" during the test, but there were no EEG correlations. (*Id.*; *see* R. at 843.) Lamar was discharged home off her medications and instructed to follow up in two weeks. (*Id.*)

On February 20, 2014, in connection with Lamar's request for reconsideration, Dr. Khurshid Khan (also from the DDS) reviewed Lamar's record and reached essentially the same conclusions as Dr. Golkar. (ECF No. 20 at 7; R. at 133–34, 143–44.)

On October 10, 2014, Lamar met with Dr. Perlin for her seizure disorder. (ECF No. 20 at 7.) On examination, Dr. Perlin found that she was cooperative, well-groomed, in no acute distress, had normal posture, normal chest, lung, cardiovascular and neurological examinations, and normal strength in all four extremities. (*Id.*; R. at 1089–90.) After a break in treatment for eight months, Lamar had similar findings in her July 10, 2015 and August 4, 2015 appointments. (ECF No. 20 at 7; R. at 1085–86, 1081–82.)

After being admitted to the hospital for a seizure on July 24, 2015, Dr. Amy Knorr noted in her evaluation that Lamar had had an unremarkable MRI of her brain in February 2012, a normal EEG (indeterminate date), and an abnormal February 2013 EEG—remarkable for TIRDA and TIRTA, but without clearly epileptiform features. (ECF No. 20 at 7–8; R. at 1122.) Dr. Knorr reported that Lamar's mental status examination showed that she was alert and oriented, her speech was fluent, and she was able to name, repeat, and follow cross-body commands. (*Id.*) Her motor examination showed she had 5/5 strength in the left upper extremity, but mild weakness of grasp in the right upper extremity. (*Id.*) Lamar's blood level contained 5.4 mcg/mL of carbamepine and 22 mcg/mL of levetiracetam. (ECF No. 20 at 8; R. at 1147.)

## B. Procedural History

On August 14, 2013, Lamar filed a Title II application for a period of disability and disability insurance benefits and supplemental security income, alleging a disability beginning on

February 1, 2011. (R. at 32.)  The Commissioner initially denied her claims on October 30, 2013

and on reconsideration on February 21, 2014. (*Id.*)  After the November 5, 2015 hearing, the ALJ

denied her claim on February 26, 2016. (R. at 43.)  The ALJ found that Lamar had a medically

determinable impairment that was severe but did not meet or medically equal the criteria of an

impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 35–36.)  He concluded that

she had the residual functional capacity to do medium work, with several limitations. (R. at 36*.*)

The Appeals Council denied Lamar's appeal of the ALJ's decision on April 26, 2017, rendering

the ALJ's decision the Commissioner's final decision. (R. at 1.)

## II.     Legal Standard

"A district court reviewing a final . . . decision [of the Commissioner of Social Security]

pursuant to . . . 42 U.S.C. [§] 405(g), is performing an appellate function." *Zambrana v. Califano*,

651 F.2d 842, 844 (2d Cir. 1981).  The ALJ's decision "may be set aside only due to legal error or

if it is not supported by substantial evidence." *Crossman v. Astrue*, 783 F. Supp. 2d 300, 302–03

(D. Conn. 2010) (citation omitted). Substantial evidence is "'more than a mere scintilla' and

'means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (quoting *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971)).  Under this deferential standard of review, "[i]f evidence is

susceptible to more than one rational interpretation, the Commissioner's conclusion must be

upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted); *see also Mongeur*

*v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required

to examine the entire record, including contradictory evidence and evidence from which

conflicting inferences can be drawn.").  The Court may not supply a new or different rationale for

the ALJ's decision. *See SEC v. Chenery Corp.,* 318 U.S. 80, 95 (1943).  Where the ALJ has not

supplied an adequate rationale, the Court may ordinarily "look to other portions of the ALJ's decision and to clearly credible evidence in finding that [the ALJ's] determination was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (per curiam). In those instances, "the ALJ's failure to articulate his reasons can be harmless error." *Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *5 (D. Conn. Dec. 21, 2017). But where the Court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ," this Court must remand for further findings or a clearer explanation of the decision. *Id.* (quoting *Berry*, 675 F.2d at 469).

## III.    Discussion

The ALJ must follow a five-step sequential evaluation process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

> (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. *If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience*; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work the claimant could perform.

*Machnicz v. Berryhill*, No. 3:16-CV-741 (MPS), 2017 WL 2294284, at *1 n.1 (D. Conn. May 25, 2017) (emphasis added); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof each step except the fifth, as to which the Commissioner bears the burden. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). At the third step, if the claimant carries her burden

to show that her impairments meet or medically equal a listed severe impairment, she is *per se* disabled and thus qualified for benefits. *See Howarth*, 2017 WL 6527432, at *3 (quoting *Petrie v. Astrue*, 412 Fed. App'x 401, 404 (2d Cir. 2011)).

In this case, the ALJ found that the first two steps were satisfied: that Lamar was not engaged in substantial gainful activity and had three severe impairments, including "seizure disorder with mild tremors." (R. at 34–35.) However, the ALJ determined at step three that Lamar's seizure disorder did not meet two seizure-related listings in Subpart P, Appendix 1: Listings 11.02 and 11.03. (R. at 36.) The ALJ therefore proceeded to step four and considered Lamar's residual functional capacity ("RFC"). (R. at 36–41.) After a detailed survey of the record—including Lamar's statements, those of her neighbor, Stacey Orr, the opinions of Lamar's primary care physician and two state doctors, and other medical records and test results—the ALJ determined that Lamar could engage in "medium" work as defined in the applicable federal regulations, subject to certain functional limitations. (*Id.*) Finally, the ALJ found at step five that Lamar could perform her past work as a daytime teacher's aide or other jobs existing in sufficient numbers in the national economy. (R. at 41–42.) Accordingly, the ALJ concluded that Lamar was not disabled as defined in the Social Security Act and denied her benefits. (R. at 43.)

Lamar and the Commissioner now dispute whether the ALJ (1) correctly concluded that Lamar's seizure disorder did not meet the listing requirements at step three, (2) properly weighed the opinion evidence of Lamar's treating physician, or (3) appropriately accounted for Lamar's limitations in the RFC determination at step four. (ECF No. 17-1 at 14–22; ECF No. 20 at 11–22.) Because the ALJ's listings analysis at step three was inadequate, and because there is evidence in the record indicating that Lamar may have qualified for a listed impairment, I remand on the first issue and do not reach the remaining questions.

13

## A.  The ALJ's Listings Analysis was Inadequate

The Commissioner argues that Lamar did not meet her burden of proof to show that her seizure disorder met or medically equaled a listed impairment. (ECF No. 20 at 18.)  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zubley*, 493 U.S. 521, 530 (1990) (internal footnotes omitted).  On the date of Lamar's hearing,[3] the appropriate listings stated:

> 11.02 Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
>
> > A.  Daytime episodes (loss of consciousness and convulsive seizures) or
> >
> > B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.
>
> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404 Subpt. P, app. 1 §§ 11.02, 11.03 (effective August 12, 2015 to May 23, 2016).

Listing 11.00A explains that:

> In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures. At least one detailed description of a typical seizure is required. Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena. The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source

---

[3]  Although this Listing has been amended since November 5, 2015, the date of Lamar's hearing, the regulations in place at the time of the ALJ hearing are the regulations applied on appeal. *See Henry v. Colvin*, 561 F. App'x 55, 57–58 (2d Cir. 2014).

of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

Under 11.02 and 11.03, *the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.* Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels.

20 C.F.R. Pt. 404, Subpt. P, app. 1 § 11.00(A) (effective August 12, 2015 to May 23, 2016) (emphasis added).

In his decision, the ALJ stated that he had "considered the claimant's migraines and seizure disorder under 11.00 (Neurological Disorders)." (R. at 36.) The ALJ summarily concluded that Lamar did not meet any qualifying listing, stating: "[w]hile [Lamar's] representative argued that the claimant's condition meets listing 11.02 and 11.03, there is no evidence of seizures occurring more frequently than one a month in spite of three months of prescribed treatment with either daytime episodes or nocturnal episodes manifesting in residuals during the day, as required by listings 11.02 or 11.03." (*Id.*) The ALJ further noted that Lamar's excess weight, though an impairment, was not a standalone listing and did not otherwise alter his listings conclusion. (*Id.*) Besides his observation that "claimant is five feet, one inch tall and testified that she weighed 260 pounds," the ALJ's step three analysis did not cite any record evidence. (*Id.*)

The ALJ's rationale is inadequate. Although Lamar carried the burden of proof, the ALJ had a responsibility to "articulate the specific reasons for finding that the listing has not been met, including discussion of the uncontroverted evidence that supports the claimant's application for benefits, and the significantly probative evidence that he or she rejects." *Howarth*, 2017 WL

6527432 at *8 (internal quotation marks omitted) (quoting *Cross v. Astrue*, No. 08-CV-0425 (VEB), 2009 WL 3790177, at *3 (N.D.N.Y. Nov. 12, 2009)). Here, however, the ALJ's entire analysis of Listings 11.02 and 11.03 consisted of a single paragraph in a twelve-page opinion. The ALJ conclusorily asserted that there was no evidence that the seizures occurred at least once a month (the lesser frequency required by 11.02) despite three months of treatment. But in reaching that conclusion, the ALJ did not clearly explain which of the required elements of the listings Lamar did not meet, for instance: (a) whether Lamar's seizures occurred with the frequency required by either listing; (b) whether Lamar had provided a "detailed description of a typical seizure pattern, including all associated phenomena"; or (c) whether Lamar had shown three months' compliance with her prescribed antiepileptic treatment. The ALJ also did not state what evidence he had considered in reaching the conclusion that these listings did not apply, how he weighed Lamar's evidence in support of her claim, or whether Lamar's evidence was contradicted—in fact, the 11.02 and 11.03 analysis does not cite *any* evidence in the record. The ALJ's conclusory statements are simply inadequate to allow for meaningful judicial review. *See Howarth*, 2017 WL 6527432, at *5 (remanding where the court is "left to infer that the ALJ reached [his] decision [that claimant did not met the elements of the listing] based on the ALJ's ultimate conclusion that [claimant] did not meet or equal the listing").

## B.    Remand is Appropriate

Remand is appropriate because I am unable to discern the ALJ's listings rationale from the rest of his decision or the record as a whole, especially given the credibility determinations and inferences required. *Berry*, 675 F.2d at 469.[4] The ALJ here did engage in an extensive treatment

_____

[4] Although the harmless error standard is often stated as whether the ALJ could reach "only one conclusion" on remand, this standard is most often applied when the ALJ applies incorrect

of Lamar's RFC, analyzing the statements of both Lamar and her neighbor, the opinions of Lamar's treating physician and state doctors, and other medical records and test results, including EEG reports. (R. at 36–41.) The Court is nonetheless largely left to speculate how the evidence discussed in the ALJ's RFC rationale applies in the Listings context, as the ALJ did not make the necessary findings on issues pertinent to his determinations at step three of the disability analysis, such as the frequency of Lamar's seizures, whether those seizures demonstrated all associated phenomena, or whether Lamar complied with her prescribed course of treatment. *See White-Swanson v. Colvin*, No. 6:14-CV-01070 (MAD), 2016 WL 917945, at *4 (N.D.N.Y. Mar. 10, 2016) (remanding because ALJ's "bald conclusion that the record is 'devoid' of evidence of Plaintiff's typical seizure pattern in spite of at least three months of prescribed treatment" did not allow court to review listings determination where contrary evidence existed).[5] More importantly, the record viewed as a whole suggests that Lamar may have met actually the requirements of either Listing 11.02 or 11.03. In particular, the record contains significant evidence that: (1) Lamar's seizures occurred at least once a month; (2) notwithstanding several normal EEG results, Lamar provided a detailed description of her seizure pattern; and (3) Lamar complied with her

---

legal principles, not when the ALJ's decision fails to offer a rationale in support of a conclusion. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."). Even if that standard applied, remand would be appropriate here because there is contrary evidence in the record to support a finding that the listings were met and because I "cannot determine with certainty from the record before [me] whether [the ALJ] found such evidence to have been [insufficient to meet the listing] or whether he neglected to apply the [listing requirements]" at all. *Id.* at 987.

[5] For example, the ALJ relies on the state doctors' opinions in his RFC determination. (R. at 40.) Those opinions appear to assume that Lamar did not qualify under Listing 11.03 even though she had "severe" minor motor seizures. Neither opinion analyzes listing 11.02. Further, the ALJ ultimately gave both opinions "less weight" because Lamar's impairments were more severe than either doctor concluded. (*See, e.g.*, R. at 40, 107, 132.) The Court is thus unable to determine what role these opinions played (if any) in the ALJ's analysis of Listing 11.02 or 11.03.

17

antiepileptic medication treatment for at least three months, as required by Listings 11.02 and 11.03. Especially in light of the credibility determinations involved, I cannot infer how the ALJ assessed the contrasting evidence on these points, and so I conclude that remand is appropriate. *Howarth*, 2017 WL 6527432, at *7 (D. Conn. Dec. 21, 2017) ("[W]ithout an articulation of the ALJ's reasons, the court cannot review whether the ALJ considered the contrasting evidence or how the ALJ reached his conclusion.")

### 1. *Seizure Frequency*

Although the ALJ suggested that there was "no evidence" that Lamar's seizures occurred with a frequency of more than once a month as required by 11.02 and 11.03, the ALJ did not address the significant evidence to the contrary. (R. at 36.) Several treatment notes in the record indicate that Lamar contemporaneously reported seizures occurring at a frequency of at least once a month. (*See, e.g.,* R. at 449–51 (4/28/2013 consultation reporting two seizures in a month); R. at 687 (8/22/2013 Progress Notes describe "2-3x/month" frequency); R. at 957 (11/14/12 Progress Notes reporting 5 or 6 seizures per month); R. at 1061 (1/14/2014 discharge note reports "2-3x a month" frequency); R. at 1175 (11/13/2015 reported frequency of "once every couple of weeks").) At the hearing, Lamar testified that she had minor seizures two to three times a week, and Lamar's neighbor, Stacy Orr, also testified that Lamar had over a hundred seizures in a year. (R. at 73, 81, 86.) However, in his RFC analysis, the ALJ discounted Lamar's testimony at the hearing because "she alleged greater limitations and seizure activity at the hearing than what is documented in her treatment notes"; he similarly credited Orr's testimony only "to the extent it is supported by the objective medical evidence" due to her lack of medical qualifications and relationship to Lamar. (R. at 40.) The ALJ did not however address the contemporaneous treatment notes, in which Lamar consistently reported for over two-and-half years that her seizures occurred more than once

18

a month. (*See also* R. at 616 (Lamar's daughter reports witnessing four episodes in a day).)  The ALJ made no findings that Lamar was exaggerating or not credible in the statements reflected in those notes; his credibility findings were limited to Lamar and Orr's testimony at the hearing. Without addressing the treatment notes, the ALJ could not properly conclude there was "no evidence" that Lamar's seizures occurred with the requisite frequency.

### 2. *Detailed Description*

Lamar also showed what potentially amounted to a "detailed description" of her seizure patterns, but the ALJ's RFC analysis discounted her supporting evidence due to several normal EEG results. (R. at 39.)  Both Listings 11.02 and 11.03 require at least one "detailed description of a typical seizure" with all associated phenomena that documents "the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena." *See* 20 C.F.R. Pt. 404, Subpt. P, app. 1 §§ 11.00(A), 11.02, 11.03.  The Listings caution that the claimant's description of type or frequency of seizures must be supported by testimony of another person or by professional observation, *id.* § 11.00(A); but the Listings in effect at the time did not require documentation of an EEG; the Commissioner had earlier concluded that "[a]n EEG is a definitive diagnostic tool in cases of nonconvulsive epilepsy in children, but it is rare for an EEG to confirm epilepsy in its other forms for either adults or children." *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018 at 20019 (Apr. 24, 2002).

The record here contains evidence from Lamar and her treating physician, Dr. Perlin, that suggests Lamar met the "detailed description" requirement, including evidence of loss of consciousness and the presence of other phenomena. (*See, e.g.*, R. at 80–81 (Lamar's testimony at hearing describing incontinence and post-ictal symptoms), R. at 1175 (Dr. Farooque November 2015 documentation of Lamar's reported loss of consciousness, urinary control, and tongue-biting

during seizures); R. at 1171–1174 (Dr. Perlin's November 2015 opinion showing loss of consciousness, incontinence, injuries, and post-ictal manifestations accompanying Lamar's seizures).) Nonetheless, the ALJ in his RFC analysis discounted Lamar's testimony "regarding the extent of her symptoms and limitations" and Dr. Perlin's medical opinion as inconsistent with the "numerous and extensive neurological testing since [Lamar's] alleged onset date [that] has been negative or normal" and the "benign physical findings and negative extensive neurological workups," respectively. (R. at 39, 40.) Neither Listing required EEG evidence, however, and so the ALJ could not have relied solely on normal EEG results in concluding that Lamar did not meet them.[6] *See Smith v. Colvin*, No. 3:14-CV-363-PLR-HBG, 2016 WL 3775583, at *7 (E.D. Tenn. June 22, 2016), *report and recommendation adopted*, No. 3:14-CV-363-PLR-HBG, 2016 WL 3822516 (E.D. Tenn. July 13, 2016) ("[T]he Plaintiff's normal EEG findings do not preclude her from satisfying the Listings."). Further, the ALJ's only stated rationale for his listings conclusion—cursory though it was—suggests that his conclusion was based on a perceived failure to meet the frequency requirement, not on the EEG evidence. (R. at 36.) In any event, given the ALJ's failure to make the required findings at step three, and his over-reliance on the normal EEG

---

[6] In any event, the ALJ's conclusion that Lamar's EEG results were normal is contradicted by an abnormal February 2013 test. The ALJ acknowledged that this EEG was "abnormal[] due to temporal intermittent rhythmic delta activity," but distinguished it as "demonstrat[ing] no clear epileptiform features." (R. at 39.) However, the ALJ's finding relied on a later summary of the test (R. at 1122) and downplayed its significance, as the February 2013 EEG report itself states that the results, "although not specific to complex partial seizures, [are] a common finding in patients with complex partial seizures." (R. at 627.) Courts applying previous versions of the listings requiring EEGs have cautioned that even slight neurophysical disturbances should not be dismissed out of hand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (remanding ALJ's decision based on previous version of Listing 11.03 as unsupported by substantial evidence where the ALJ had characterized an EEG showing "a slight neurophysiological disturbance" as "unremarkable"). The ALJ's characterization of Lamar's EEG history as "normal" is not adequately supported in light of this abnormal result.

results, the Court cannot determine how the ALJ would have weighed the evidence to determine whether Lamar had provided the "detailed description" required by the listings.

### 3. *Antiepileptic medication treatment*

The record also contains evidence that Lamar complied with her prescribed antiepileptic drug treatment for three months. Listing 11.00A states that "[w]hen seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment *must* include consideration of the serum drug levels." 20 C.F.R. Pt. 404, Subpt. P, app. 1 § 11.00(A) (emphasis added). The ALJ's decision nowhere addresses Lamar's compliance with her medication as evidenced by blood serum results, apparently because the ALJ concluded that Lamar's Listings argument failed at the frequency threshold. The record contains results from September 2012, May 2013, August 2013, and July 2015, indicating that Lamar's blood levels of Keppra was at a therapeutic level in September 2012 and April/May 2013, and that her blood levels of both Keppra and carbamazepine were at therapeutic levels in August 2013 and July 2015. (R at 592, 962 (September 2012 results); R. at 431–33, 599–601 (August 2013 and May 2013 results); R. at 948 (August 2013 results); R. at 1147 (July 2015 results).) The Commissioner now argues that these sporadic blood tests do not prove that Lamar was compliant for three *consecutive* months. (ECF No. 20 at 20–21.) But the Commissioner can point to no evidence in the record to indicate that Lamar was non-compliant, and more importantly, the ALJ did not even consider the blood serum evidence, let alone determine that noncompliance was responsible for Lamar's lack of control over her seizures. (R. at 39.) *Cf. Steele*, 290 F.3d at 941 (reversing for lack of substantial evidence where claimant admitted non-compliance but the ALJ did not determine that the noncompliance was actually responsible for the lack of control over the seizures). I cannot now supply a rationale not supported by the evidence.

Rather than addressing Lamar's compliance, the ALJ simply concluded in the RFC analysis that the "claimant's condition is largely stable with medication" (R. at 39), relying on a November 2013 visit report that discussed the fact that Lamar had no seizures in a single month (R. at 827) and a November 2015 admission report that indicated Lamar was discharged from a weeklong inpatient workup without medication. (R. at 1248.)  But the evidence in the record is far more mixed.  Multiple doctors noted concerns that Lamar's dosage was the maximum effective dosage and that it needed to be increased, and, in May 2013, her treating physician Dr. Perlin prescribed carbamazepine in addition to the Keppra that Lamar was previously taking, because that alone had not been effective. (R. at 451, 456 (reflecting that Lamar started carbamazepine in May 2013).) Despite being on high doses of Keppra alongside carbamazepine, Lamar's doctors observed as late as October 2013 that Lamar's seizures did not respond to medication. (R. at 797.)  And even the November 2015 admission report cited by the ALJ recognized that Lamar had to be put back on medication following a relapse. (R. at 1248.)  The ALJ's opinion does not address this record evidence suggesting that Lamar's seizures persisted despite three months of compliance with her prescribed antiepileptic drug treatment.

In sum, I cannot ascertain the reasoning underlying the ALJ's conclusion that Lamar did not meet Listings 11.02 or 11.03 given the significant contradictory evidence in the record concerning the frequency of Lamar's seizures, the symptoms described, and their persistence despite her medication.  Accordingly, the ALJ's barebones statement that Lamar did not meet the requirements of Listings 11.02 and Listings 11.03 impedes this Court from meaningful judicial review. *See Nieves v. Colvin*, No. 3:15-CV-01842 (JCH), 2016 WL 7489041, at *5 (D. Conn. Dec. 30, 2016) (remanding based on ALJ's inadequate analysis of Listings 11.02 or 11.03 where "the ALJ summarily disposed of step three with conclusory statements that [claimant] does not meet

either [11.02 or 11.03], followed by a recitation of the elements of each listing."). As in *Nieves*, "the portion of the ALJ's decision dealing with [Lamar's] claim of a listed disability is entirely conclusory and provides the court with no understanding of the basis for the ALJ's decision." *Id.* Especially in light of the contrary evidence suggesting that Lamar might qualify under one of those listings, this case must be remanded for the ALJ to engage in a more complete step three analysis.

## IV.    Conclusion

Because I find that the ALJ's determination that Lamar did not meet Listings 11.02 and 11.03 was inadequate, I GRANT in part Lamar's motion, DENY the Commissioner's motion, and REMAND to the Agency for further proceedings. Nothing in this opinion is intended to suggest a finding as to whether Lamar meets those Listings or is otherwise disabled.

IT IS SO ORDERED.

      /s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              August 1, 2018